IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
Springfield Division

MIGUEL SANTIAGO,
          Petitioner

                                    REL # 02-CR-30015

v.                                  04 - 30108 - MAP

UNITED STATES OF AMERICA,
          Respondent

### MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE PURSUANT TO 28 U.S.C. § 2255

Now comes the Petitioner, Miguel Santiago, Pro Se, and respectfully seeks the issuance of a writ of habeas corpus vacating the convictions in this case for two reasons:

1.  The Defendant maintains that defeense counsel was constitutionally ineffective in his presentation of Mr. Santiago's suppression motion because it was argued to a completely erroneous theory of law.

    Further, if the search of the Defendant's vehicle was illegal, that fact tainted the information given to his common-law wife in order to search the residence.

2.  The failure of the United States to schedule crack cocaine when it was legally declared to be an element of a drug trafficking crime.

A.  Collateral Review Of Guilty Pleas:

Convictions are ordinarily presumed to valid on collateral attack. Parke v. Raley, 506 U.S. 20, 29 [1992]. The Government always argues that it is entitled to a greater presumption of finality when the conviction rests on a guilty plea. United States v. Timmreck, 441 U.S. 780, 784 [1979], requoted in Bousley

v. United States, 523 U.S. 614, 621 [1998]. The plea is presumed
to waive all non-jurisdictional defects in the proceeding. See 1
Wright, "Federal Practice and Procedure, Criminal," 3d § 175
(1999) (omitting citations).

It is therefore necessary to evaluate whether the plea has
been "voluntary and intelligent" before it may be attacked on col-
lateral review. Marby v. Johnson, 467 U.S. 504, 508 [1984] (foot-
note omitted).[1] The basis for attack on collateral review must
usually be raised as a challenge on direct review. Bousley, 523
U.S. at 621. However, the procedural bars can be demonstrated not
to apply when the defendant can demonstrate ineffective assistance
of counsel in entering the plea. Tollet v. Henderson, 411 U.S.
258, 267 [1973]:

> "[A defendant] may only attack the voluntary and
> intelligent character of the guilty plea by show-
> ing that the advice he received was not within
> the standards [required by the Sixth Amendment]."

B.  Ineffective Assistance of Counsel:

Strickland v. Washington, 466 U.S. 668 [1984], articulates
the standards respecting ineffective assistance of counsel. The
standards also apply to defendants who enter guilty pleas as well
as those going to trial.

In sum, the defendant must show (1) that the attorney's per-
formance was constitutionally inadequate, as discussed in Strick-

---

[1] The sole exception to not showing ineffectiveness would be to
show from the face of the record and applicable statutes that the
Court had no power to enter the conviction or impose the sentence,
because the charge was one the Government could not constitution-
ally prosecute. United States v. Broce, 488 U.S. 563, 569, 574-76
[1989].

A.  Ineffective Assistance Of Counsel:

The Sixth Amendment right to counsel forms the foundation to the entire criminal justice system.  As the Supreme Court has noted, it is by far the most significant of the defendant's constitutional rights because it is the means by which the defendant asserts each of his other rights in a criminal proceeding.  United States v. Cronic, 466 U.S. 648, 652 [1984].

The Courts have been given a two prong analysis for establishing the lack of constitutionally adequate representation of counsel.  Strickland v. Washington, 466 U.S. 668, 687 [1984]. First, a petitioner must establish that counsel's performance fell below an objective standard of reasonableness; second, a petitioner must demonstrate that but for counsel's deficiencies the result of the proceeding would have been different "to a reasonable probability."

> "A reasonable probability is a probability sufficient to undermine confidence in the outcome [of the criminal proceeding]."

Strickland, 466 U.S. at 694.  Where, as a practical matter, the reviewing District Courts have seemed to gravitate to a higher standard than reasonable probability and automatically deferred to the putative tactical decisions of defense counsel, the Supreme Court has acted to return the evaluation to the true Strickland standards.  Wiggins v. Smith, 156 L.Ed.2d 471 [2003] (standard remains "reasonable probability" and counsel's decisions cannot be presumed correct absent an articulable reason for the decision).

What a reviewing Court most commonly looks for is some "breakdown in the adversarial process that renders the result unreli-

iii

able." <u>Strickland</u>, 466 U.S. at 687; <u>United States</u> <u>v</u>. <u>Cronic</u>, 466 U.S. at 659 (question on habeas review is whether counsel's representation failed to subject the critical elements of the prosecution's proof to meaningful adversarial testing).

The standard for prejudice sufficient to be cognizable on § 2255 Applications has been defined by the Supreme Court to be the imposition of "any unwarranted term of imprisonment." <u>Glover</u> <u>v</u>. <u>United</u> <u>States</u>, 531 U.S. 198, 202 [2001].

## FACTUAL BACKGROUND

The Petitioner relies upon all the records and files of this case. Because his issues relate only to the legality of matters collateral to the issue of his factual conduct, Mr. Santiago only provides his Affidavit relevant to those matters.

Where this could be a case leading to withdrawal of guilty plea, Mr. Santiago otherwise does not comment on the accuracy of the files and records but will sustain his burden of proof and leave the Government to its own.

I.    DEFENSE COUNSEL WAS CONSTITUTIONALLY INEFFECTIVE FOR
      FAILING TO ARGUE CORRECT LAW AT THE SUPPRESSION HEAR-
      RING AND FAILING TO PRESERVE DIRECT APPEAL FOR DE NOVO
      REVIEW:

Mr. Elkin did file motions to suppress the fruits of the
search of Mr. Santiago's car and the derivative search of his home.
Mr. Elkin's argument was that this had been a <u>Terry</u> stop that trans-
formed into an arrest before police found the drugs in the car.
This argument was wrong: this had been a warrantless, gun-point
arrest with less than the probable cause required for a legal arrest.
When Mr. Mastroianni replaced Mr. Elkin,  he answered the Govern-
ment response to the motion, but kept the same themes.  Thus, Mr.
Mastroianni argued Mr. Santiago's suppression to a losing standard
of review and failed to recover from error by preserving the issue
for appellate review, which would be de novo, by Mr. Santiago enter-
ing a conditional plea of guilty.

Because there was no appeal, Mr. Santiago is without any
transcript of the suppression hearing.  And, since Mr. Elkin's
Memorandum descriptions of the background facts is a little thin,
Mr. Santiago here makes the argument which should have been made
from the Government's version of the facts.  Government's Omnibus
Response, pp. 2-10.

The crux of the issue is how the federally deputized local
police accosted Mr. Santiago in his car.  This is a reality that
cannot be undone to salvage the validity of this search.  The police
actions, properly described, cannot be justified, even under the
Patriot Act.

On page eight of the Omnibus Response, the deputized Task
Force members are said to have "approached the driver's side [of

the car after it stopped] and ordered Santiago out of the car and
detained him." A more accurate, but still incomplete, account is
contained in the contemporaneous arrest report:

> 11.    Agents of the SRO and officers of the SPD effec-
> ted a probable cause arrest of Santiago at this
> time [to wit, at parking his vehicle at 129 Put-
> nam Street, Report, ¶10] without incident.
>
> During a cursory search of the vehicle subsequent
> to Santiago's arrest, SPD Lt. Edward Geier seized
> about 600 grams of suspect cocaine (Exhibit 5)
> located in a plastic bag further located on the
> passenger side floor of the vehicle.

The Petitioner invokes the judicial notice power of this
Court that there are official policy and procedures trained and fol-
lowed by police for arresting subjects. Were the Court to investi-
gate what practices would be employed in this nighttime situation,
Petitioner submits that it would find the following: use of over-
whelming numbers of officers, immediate blockage of the subject's
vehicle to prevent both escape and its use as a weapon, drawn fire-
arms, loud, authoritative commands, physical placement of the sub-
ject in a submission position on the ground, immediate application
of handcuffs. This is what "probable cause arrest ... without inci-
dent" actually entails.

Mr. Santiago's Affidavit In Support of Motion To Suppress
advised the Court of the blockage of his vehicle with police cars,
physical removal from his own car at gunpoint, and handcuffing.
Affidavit, ¶4. In the interest of completeness, Mr. Santiago pro-
vides a more detailed Affidavit. Exhibit A.

But simply from the Government's admission of arrest and
subsequent finding of cocaine, Mr. Santiago's Next Friends can only

2

conclude Mr. Mastroianni never caught on that the situation was
a pure arrest and never Terry stop, so-called. Terry v. Ohio, 392
US 1, 21 [1968] (discussing legitimate bases for "intrusion").

    This Court, as would a Court of Appeals, possesses full
power of review where this issue was decided on an erroneous legal
principle. United States v. Cochrane, 896 F.2d 635, 739-40 (1st
Cir. 1990). The only legal principle upon which to decide Mr.
Santiago's Fourth Amendment rights was that this was a full-blown
guns-drawn warrantless arrest of one person by seventeen police
officers.[1]

    When there is a warrantless arrest the basis for deciding
any violation of rights question shifts from Terry v. Ohio or
Illinois v. Gates to United States v. Watson, 423 U.S. 411, 414-
24 [1976]; Brinegar v. United States, 338 U.S. 160, 175-76 [1949];
Henry v. United States, 361 U.S. 98, 102 [1959]. The standard
today remains as it was succinctly articulated in Henry:

> Arrest without a warrant is limited to offenses
> committed in the presence of police or to in-
> stances where police have reasonable grounds to
> believe the person to be arrested has committed
> or is committing a felony but no opportunity to
> obtain a warrant.

    American law still presumptively begins with the principle
that "warrantless searches, seizures, [arrests] are constitution-
ally impermissible unless supported by probable cause and justi-
fied by either exigent circumstances or another recognized excep-
tion to the Fourth Amendment requirement. United States v. Cresta,

---

1. The arrest report for Mr. Santiago's arrest names seventeen po-
lice for credit.

542 F.Supp. 889, 899 (D.Me. 1984), citing <u>Coolidge</u> <u>v</u>. <u>New Hamp-</u><u>shire</u>, 403 U.S. 443, 454-55 [1971].  And the justification for a warrantless arrest falls totally on the Government to validate its actions that they were performed for articulable probable cause to arrest <u>and</u> an exigency squarely within the warrant exceptions. <u>Vale</u> <u>v</u>. <u>Louisiana</u>, 399 U.S. 30, 34 [1970].  The defendant's only burden is to show that he was in circumstances where a reasonable person could expect to be secure in his person.[2]  <u>Rawlings</u> <u>v</u>. <u>Ken-</u><u>tucky</u>, 448 U.S. 98, 104-06 [1980].

This last point is most easily disposed of first.  Mr. Santiago was in his automobile on a public street several blocks from where he lived.  Petitioner does not believe that the Government can honestly dispute that he was where the citizen can universally expect to be secure from warrantless arrest of his person.

A. Probable Cause:

The second facet of analysis is whether authorities had acquired sufficient information to obtain a warrant to arrest an unnamed subject.  The Government had and has a major problem here because the objective fact that agents did not <u>seek</u> a warrant is <u>per</u> <u>se</u> evidence of subjective belief a warrant would not issue on the evidence available.  This Court, sitting as magistrate, can decide for itself:

> 1. This morning a true bill indictment returned against one Bernie Ruiz for sale of crack cocaine on three occasions.

_____

2. The dividing-line example for current times where a person could not expect to be secure in his person from arrest is at the fence of a nuclear power plant.

2. On the last occasion, March 6, agents surveilled Ruiz before the sale.  He met with a Hispanic male who was driving a four door red Pontiac Mass Registration 120 3NL near 134 Putnam Circle for about two minutes in the car.  After this meeting, he drove directly to the sale point and delivered 52.7 grams of crack cocaine. Agents found the red Pontiac to be parked at 48 Putman Circle the next day.

3. Upon his warrant arrest this afternoon, Ruiz described his cocaine source to be "Papito," a Dominican male, 5'11", 210 pounds, no facial hair, short dark hair otherwise, approximately 36 years old, driving a burgundy, four-door car.  At agent's request, Ruiz has agreed to page "Papito," as he said was prearranged, to bring the half kilogram to the vicinity of 129 Putnam Circle.

4. Ruiz possessed a gun and has made verbal threats of death.

5. Agents want a warrant to arrest an unnamed subject who arrives at the vicinity of 129 Putnam Circle in a burgundy/red four-door sedan at the approximate time arranged for the meeting.

United States v. Hensley, 461 U.S. 221, 232 [1985] (discussing collective knowledge).

Obviously, your Petitioner has not included the fluff that appears in these affidavits; but neither has he excluded any key fact known to the agents at the time.  The Court will have to acknowledge that the best that can be said for the Government evidence is that it statistically narrows the field.[3]  The was no effort made to identify "Papito" with particularity.  There was no history of truthful tips by Ruiz.  There was the corroboration of the short meeting surveilled on March 6.  But there had been no effort made in fifteen days to identify the red Pontiac subject observed on March 6.

_____

3. The Petitioner does not use the term "field" conversationally. "Field" is a mathematical term in linear algebra/group theory for the membership of a basis. The arrest reports make it pretty plain that police "arrested" the car; whoever drove the car was inciden-

This is really a close judgment call for any Magistrate.
Matters absolutely have to develop further in order to issue a valid
warrant, however.  Contingencies of the moment, completely unantici-
pated Petitioner believes, would make the issuance of a preemptive
warrant impossible.  The warrant would be based at best on two
events with incompete information from each occasion.  This is as
poor as it gets, hopefully, before a warrant of arrest could issue.
And Petitioner believes a reasonable Magistrate would not issue.

Had police sought a search warrant only, things improve for
the Government.  This is presumably why Mr. Santiago lost the sup-
pression hearing.  But the search-warrant, Terry-stop question was
purely academic.  Seventeen police with guns drawn blocked in Mr.
Santiago's car with screeching tires and stormed his car from all
directions at the same time, pulled him from the car to the ground,
and handcuffed him.  Then, they searched.

It is incredible for defense counsel to ignore the true facts
that were plain as day and argue a fairty tale on Government-dictated
terms instead.  Terry stop?!  Even the Government hedged from claim-
ing a Terry stop.  Government Omnibus Response, p. 16.  Then the
Government Memorandum was long in the tooth of serenading the Court
with case law stories in detail while minimizing the real facts of
this case.  If the defense bar is being criticized in the media for
allegedly foisting false theories of defense, the Government is doing
no less here.  The defense assisted the minimizing of the true case
facts with either tacit, naive, or active acquiesence.  In such a
case, such minimal defense representation is like having two pro-

_____

tal.  Ruiz was not brought to the scene for identification.  The
opportunity for accidental arrest was real and even calcuable.

6

secutors in the courtroom, one open, the other disguised as a
frined.

    B.  Exigent Circumstances:

    Even if probable cause is said to exist to perform an
arrest, police have the serious responsibility to explain why they
did not <u>seek</u> a warrant over circumstances they were orchestrating.
The question in this case is "attitudinal."  This case says "when
affairs meet our [police] standards, we act."  This is precisely
th  type of jaded authority that this Court is obliged to contain
in all its manifestations.  The appearance here is that police
deliberately avoided involving the magistrate until it had a fait
accompli to tout as a success.

    Police had ample opportunities to conduct themselves differ-
ently and follow the strictures of the Fourth Amendment.  Ruiz was
arrested before 4:00 P.M. and was cooperating fully.[4]  He was
brought to a police station; so there was no communication problem
with a court or secretarial problem with drafting warrant applica-
tions.  Agents had an indeterminant amount of time to formulate
plans.  Police had even pre-selected the day on which these events
were happening; there was no need in this case to do this deal on
March 21st; March 22, 24, or the next week would do.

    Thus, it is impossible for police to claim the serendipitous
existence of exigent circumstances fortuitous enough to have seven-

---

4. Note that authorities claim no information that "Papito" was
armed or dangerous.  <u>Sims</u> <u>v.</u> <u>Georgia</u>, 389 U.S. 404 [1967] (were a
party to claim evidence on a subject, but fail to produce it, any
presumption of Court must be for the opposing party).

teen diverse people ready to arrest Santiago.  <u>Coolidge</u>, 403 U.S.
at 455.

    C.  Ineffectiveness of Counsel:

    When Counsel chose to argue a truly pathetic theory of
defense, he was arguably throwing the case.  This "strategy" was
objectively worse than presenting no suppression motion, as was
found to be ineffective assistance in the seminal Supreme Court
case of <u>Kimmelman</u> v. <u>Morrinson</u>, 477 U.S. 365 [1986].  Mr. Elkin had
the Defendant proffer an affidavit that is largely sanitized of
details; but the affidavit still claims a full arrest before the
search.  Yet neither Mr. Elkin nor Mr. Mastroianni cite the correct
law (<u>Watson</u>, <u>Binnegar</u>, <u>Henry</u>) for deciding the suppression question.
This is ineffective assistance.

    D.  The Derivative Search Of 48 Putnam Avenue:

    The basis for the search of 48 Putnam Avenue derived from
the illegal arrest of Mr. Santiago.  The agents who went to search
the residence told Marangeli Rosario that their reason was that
they had just arrested Miguel Santiago with a large quantity of
drugs and they had seen him come from this residence.  On the basis
of the reasons she was told only, did Ms. Rosario allow police to
enter her and Santiago's home.

    It is well established that the fruits of the poisonous
tree must be suppressed in order to discourage police from circu-
itous ways to circumvent the Warrant Requirement of the Fourth
Amendment.  <u>Wong Sun</u> v. <u>United States</u>, 371 U.S. 471 [1963].  Here
police could never lawfully have obtained access to 48 Putnam

Avenue without the discovery of cocaine in Mr. Santiago's vehicle
and that discovery was the result of Mr. Santiago's unconstitution-
al arrest.  No information otherwise enters this case but for the
information developed on March 21.

Accordingly, if Mr. Santiago prevails on his main arrest
issue, the prejudicial derivatives of that arrest must also be
undone.

E.  Relief:

Whether Mr. Santiago should seek to withdraw his plea for
the nunc pro tunc suppression of evidence is an issue for which
there should be appointment of counsel to evaluate the new posture
of the Government case and advise.  However, there are alternatives
to a full re-trial that meet the Glover prejudice standard as well.

While the fruits of an illegal search are not generally sup-
pressed for sentencing, the warrantless arrest in this case is de-
finitely warranting of sanction.  Therefore, the Petitioner can
propose that the drug quantities in his vehicle (about 600 grams
of cocaine) and home (about 46 grams of alleged crack) be suppressed
as sentencing weight.  And, or alternately, the Petitioner could be
allowed to plead to the substantive counts (one or both) and the
conspiracy conviction could be vacated.  This would leave Mr. San-
tiago below the mandatory minimum sentence drug quantity.  Finally,
to the extent that this Court factored Mr. Santiago's, also known
as Judia Bonilla, alias as obstructive conduct in sentencing at the
Guideline maximum, that conduct pales in comparison with the consti-
tutional violation being litigated here.  Relief within the Guide-
line range is certainly warranted.

9

This discussion, of necessity, contains too many hypothet-icals to be concrete at this time.  The Constitutional violation is the prejudice here, however, which deprived the Defendant of the types of plea bargaining leverage being described.  The Writ must issue to restore the right erroneously taken away, regardless of the ultimate practical relief that might result.

II.    **CRACK COCAINE AND COCAINE FREE BASE ARE NOT PROSECUTABLE AS CONTROLLED SUBSTANCES BECAUSE THEY HAVE NEVER BEEN SCHEDULED AND NEITHER A PROSECUTION NOR A PENALTY CAN BE ENTERED FOR CRACK COCAINE FOR LACK OF SUBJECT MATTER JURISDICTION:**

This District has seen an argument made some years ago that maintained it was necessary for crack cocaine ("crack") or cocaine free base to be scheduled before a defendant could be prosecuted or penalized for acts with these substances. In the beginning of presenting the argument, the various Offices of United States Attorneys did attempt to object authentically to the argument presented on the merits. But all objections were answerable and eventually preempted in new arguments in the evolving presentation of the issue. None of the substantive objections are worth recounting today because none survived to ever become a reason for denial of relief in any decision.

Instead, the Courts all denied relief based on what became called the "Gibbs argument."[5] United States v. Gibbs, 813 F.2d 596, 600 (3rd Cir. 1987) (seminal case holding that 21 U.S.C. § 841(b) was only describing "sentencing factors"). The logic was that 21 U.S.C. § 841(a) was able to derive jurisdiction for cocaine, in all forms, being a scheduled substance. Thereafter, a court need not hold Congress accountable for scheduling each form when various forms only represented factors to be applied at sentencing.

While superficially appealing, and heartily adopted by proponents of the status quo, the logic possessed a fallacy in its presumption, i.e., that crack cocaine and scheduled cocaine shared the

_____

5. So-called because a large number of the arguments were in Third Circuit Districts. The Third Circuit expressly held that if the Petitioner's were right, their issue was fully jurisdictional. United States v. Croussett,

same substantive identity per the definitions and principles of
the Controlled Substance Act. <u>Vide</u> <u>infra</u>. But at least having
said something disingenuously clever, all the Courts where the
argument was presented <u>refused</u> to analyze the issue any deeper.
It was, as Mark Twain once observed in "The Mysterious Stranger":
When we want something very badly, we do not go looking for the
right and honest reasons, but just plausible ones to pawn off as
true reasons [and shut off discussion].

It was the position of movants making the argument, though,
that the parties were talking apples and oranges at each other.
The Government wanted the issue decided from purely a sentencing
point of view. In this Circuit, the Court of Appeals position was
that if the Government had secured a generic controlled substance
conviction, then which and how much controlled substance were just
fodder for sentencing. And at sentencing the nature of the con-
trolled substance was just some of the "any information" statuto-
rily usable for that sentencing. <u>United States</u> v. <u>Austin</u>, 239 F.3d
1, 7 n. 2 (1st Cir. 2001), citing <u>Williams</u> v. <u>New York</u>, 337 U.S.
241 [1949].

The movants asked the Courts to address the issue from the
point of view of the guarantees of the Controlled Substances Act
that <u>new</u> substances would be evaluated for abuse potential and,
if found present, new substances would be scheduled to notice them
as illegal to the public. As was later shown, to no political or
legal concern whatsoever, the grandiose claims of harm (which had
never been objectively evaluated) were shown medically to be base-
less. D.K. Hatookami and M W Fishbein, Journal of the American
Medical Association, Vol. 276, No. 19, p. 1580 ff. (Nov. 20, 1996).

12

And due process notice was so ludicrous that definitions of what was "crack" was given for years by arresting agents testifying to convict the defendant.[6]    Eventually the Sentencing Commission produced an ad hoc definition of what crack "usually" looked like. U.S.S.G. § 2D1.1, Commentary Note D.

Despite the sledgehammer obviousness of the disparity between what the Controlled Substances Act promised for Due Process protection and the "zero" actually supplied, no court could be motivated to oppose the will of Congress illegally producing an arrogant and gross fraud on competence.    Even when on attempted appeals the Courts were shown that the issue could be approached differently, Barefoot v. Estelle, 463 U.S. 880 [1983], no Court of Appeals would entertain dissention.    Frankly, anyone with the intelligence to follow the arguments would have to question whether American rule of law still trumped politics.

There has been an as yet not fully implemented seachange in drug law jurisprudence.    Apprendi v. New Jersey, 530 U.S. 466 [2000], has enforced the Constitutional principle that when a fact has the potential to dictate a higher maximum statutory sentence it becomes an essential element of the case, which must be decided by the jury.[7] In this case, the presence of the crack cocaine transaction of March 6 (52.7 grams) has made this a 21 U.S.C. § 841(b)(1)(A) sentence, with a mandatory minimum more important to the Defendant than the statutory maximum.    Regardless of the incidentals to individual de-

---

6. The Court will probably recall that forensic chemists invariably waffled when asked to pronounce a technical difference between "crack" and cocaine.

7. The consideration of potential prejudice for a defendant erroneously labeled a "kingpin," however, is being restricted to an eval-

fendants, the premise upon which the previous crack-justifying ju-
risprudence has hinged has been seriously undermined. United Sta-
tes v. Gallo, 195 F.3d 1278, 1284 (11th Cir. 1999) (precedent not
binding once it has been substantially undermined by Supreme Court
jurisprudence).

If this development were the extent of it, it would still be
legally enough to warrant a full re-evaluation of the need for
scheduling. But re-examination of the § 841 interpretation has now
also revealed that the "captions" "Unlawful Acts" [§ 841(a)] and
"Penalties" [§ 841(b)], universally relied upon in judicial inter-
pretation of the statute, were added by annotators and Title 21 has
never been codified! United States v. Vasquez, 271 F.3d 93, 111
(3rd Cir. 2002) (Becker, C.J., discussing historical background).

This is a tremendous oversight and all interpretive law that
fails to take the true facts into account becomes pseudo-interpre-
tative. Judge Becker goes on to show how the Office of United
States Attorney itself interpreted the 1986 C.S.A. Amendment to re-
quire the proof of drug identity and quantity as elements defining
the statutory drug offense. "Handbook on the Anti-Drug Abuse Act
of 1986," pp. 20-21 (March, 1987). Id. at 110. A reading of
House of Representatives Report Number 99-845 (1986) at page 12,
Judge Becker says, produces the same conclusion. None of these sab--
otaging elements of history have ever been acknowledged by propo-
nents of the "sentencing factor" interpretation let alone ration-
alized.

---

uation of the imprisonment time imposed, which is fungible among
§§ 841(a), (b), (c), and even (d). No consideration is being given
for the Class of felony labeling.

Even when a particular case would not be affected by a sub-
stative constitutional defect to the statute, the statute must be
declared void.

> Although a criminal statute may be neither
> vague, overbroad, nor otherwise invalid as
> applied to the conduct charged against a
> particular person, nevertheless he is per-
> mitted to raise the argument as applied to
> others if the law is found deficient, un-
> less and until a satisfactory limiting con-
> struction be found because the unnarrowed
> form tends to suppress constitutional right.

Chapman v. United States, 500 U.S. 453, 470, 111 S.Ct. 1919, 114
L.Ed.2d 524, 545 [1991]. Mr. Santiago, however, can claim that this
unscheduling affects him in multiple ways. First, it accounts for
the major portion of his sentence based on Guideline penalties that
are expressly proportioned to the statutory penalty. Second, he
has been given a propaganda sentence stigmatizing him greater than
a cocaine sentence would. One predictable effect of this propa-
ganda will be his treatment should he attempt to return to the
United States, even of that is forty years from now. Third, the
presence of a crack cocaine sentence changes the mandatory minimum
below which this Court could not go in correcting for the first
issue of this argument.

A sentence imposed for the full weight of drugs as cocaine is
based on Offense Level 26. With full credit for acceptance of re-
sponsibility, Mr. Santiago's sentence could be as low as 51 months.
For all these reasons, he re-raises the argument.

15

CONCLUSION

The sheer volume of cases is affecting the fundamental values of the Country. Justice Brandeis considered it a strength to the American System of Government that the States were each free to experiment with the laws affecting society and new ideas would be tried out, accepted or rejected. New State Ice Co. v. Liebman, 285 U.S. 262, 311 [1932].

The hegemony enforced in drug law by the federal government is, in a term, no good. Petitioner believes that the way to end the drug war is to make them all as cheap as dirt. But no sovereignty can even posture itself to try any experiment or variations.

The crack cocaine story is legitimate propaganda fodder for enemies of America and an insult to the American People who trust their Government. In Perez v. United States, S.Ct. No. 99-380, it was recounted how that defendant was castigated at his sentencing with how the 350 kilograms of cocaine he sold in eleven months had probably all been sold as crack cocaine on Philadelphia streets. To which, he replied, "I couldn't have done it without the D.E.A." backoff order "because they wanted to take my mother's properties." Although the Supreme Court denied certiorari, many people took notice.

This case likewise warrants the highest standard of review both for Mr. Santiago's constitutional rights and for the broader constitutional right which the People have that all substantive rights will be protected deeply. When that is done, Petitioner prays that the Writ will issue on both grounds for relief.