I.  "CRACK COCAINE AND COCAINE FREE BASE" ARE TODAY STILL UNSCHEDULED DRUG SUBSTANCES NOT SUBJECT TO PROSECUTION FOR LACK OF SUBJECT MATTER JURISDICTION:

The Petitioner's claim of error under this section reduces to a simple set of questions, the answers to which dictate the legally correct result to the issue:

1. Must "legally new" drugs be scheduled before offenses involving them can be prosecuted by the law?  Yes.

2. Is "crack cocaine" a "legally new" drug?[1] Yes.

3. Is or was "crack cocaine" ever scheduled?  No.

4. Can this conviction be sustained for an uncontrolled substance?  No.

The ultimate issue is jurisdictional.  A challenge to jurisdiction is recognized as cognizable at any stage of the proceedings. Hagans v. Lavine, 415 U.S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577 [1974] (whenever jurisdiction is challenged, it must be proved). No version of this argument has ever been answered on the merits. Where the issue is one of paramount importance to a whole class of similarly affected defendants, this Defendant is certainly owed a fully reasoned decision on the merits. United States v. Baynes, 548 F.2d 481, 482 (3rd Cir. 1977) (function of court of appeals remains to write reasoned opinions on questions of first impression for which no clear precedent exists).

Hereafter, Appellant discusses each question above in turn.

A.  New Drug Substances Must Be Scheduled Before Conduct Involving Them may Be Prosecuted:

The Controlled Substances Act (C.S.A.) of 1970 does not contain any proposition that all substances are controlled and subject to criminal prosecution unless granted a governmental

1

dispensation under the Act. Rather, it begins from the proposition that all substances are free to be used <u>until</u> the Government demonstrates to certain precise criteria a compelling social need that the substance must be controlled and acts to control the substance.  H.R. 91-144, p. 22.

> "A procedure is established for the classification of future drugs which create abuse problems."

Report of the Committee on Interstate Commerce on the Comprehensive Drug Abuse Act, Summary of the Bill, Title II:  Control and Enforcement, H.R. No. 18583.

The public protection adopted was a mandatory and rigorous evaluation by technical professionals of the substance proposed for control with the overview of high-ranking Government officials, i.e., the Secretary of Health, Education and Welfare and the Attorney General.

> "When adding a substance to a schedule, the Attorney General <u>must</u> follow specified procedures.  First, the Attorney General <u>must</u> request a scientific evaluation from the Secretary of Health and Human Services (HHS), together with a recommendation as to whether the substance should be controlled.  A substance <u>cannot</u> be controlled if the Secretary recommends against it.  21 U.S.C. § 811(b). Second, the Attorney General <u>must</u> consider eight factors with respect to the substance, including its potential for abuse, scientific evidence of its pharmacological effect, its psychic or physiological dependence liability, and whether the substance is an immediate precursor of a substance already controlled.  21 U.S.C. § 801(c).  Third, the Attorney General <u>must</u> comply with the notice-and-hearing provisions of the Administrative Procedures Act (APA), 5 U.S.C. §§ 551-559, which permits comment by interested parties.

---

[1] Petitioner uses the term "crack cocaine" for whatever is crack coczaine or cocaine free base rather than repeat both terms throughout the discussion.

2

> 21 U.S.C. § 811(a). In addition, the Act permits any aggrieved person to challenge the scheduling of a substance by the Attorney General in a Court of Appeals. 21 U.S.C. § 877."

Touby v. United States, 500 U.S. 160, 162-63, 111 S.Ct. 1752, 114 L.Ed.2d 219 [1991] (emphasis added).

Whenever the Courts of Appeal have been presented with a drug substance having a structure that is chemically distinguishable from any substance already scheduled, they have strictly enforced the scheduling requirement. United States v. Spain, 825 F.2d 1426 (10th Cir. 1987); United States v. Emerson, 846 F.2d 541 (9th Cir. 1988). The defect is fatal. United States v. Caudle, 828 F.2d 1111, 1112 (5th Cir. 1987) ("Defendants clearly could not be indicted for distributing a drug that was not placed on the list of controlled substances"). Until today, there has never been a controversy over an alternate form of a drug containing an active ingredient, already scheduled, that nonetheless requires scheduling in its own right. This is because on the few previous occasions where the situation has arisen the Attorney General has acted preemptively and scheduled or rescheduled the substance before initiating any prosecutions. Vide infra. In so doing, the Attorney General was responding to circumstances already anticipated by the drafters of the Controlled Substance Act, i.e., the "drug within a drug,"

> "(4) The drug or drugs containing a substance are new drugs so related in their action to a drug or drugs already listed as having a potential for abuse to make it likely that the drug will have the same potentiality for abuse as such drugs, thus making it reasonable to assume that there may be significant use contrary to or without

> medical advice, or that it has a substantial capability of creating hazards to the health of the user or to the safety of the community."

Recommended Criterion Number 4 for evaluation of "new drug substance" scheduling as discussed in H.R. 91-1444, p. 34.

While the 1970 language reflects a higher sensitivity to diversion from the legitimate sources rather than to clandestine drug manufacture, the legal principle is not altered for this difference: the presence of a controlled substance in the new substance does not automatically define the new substance as controlled.

As example, witness the treatment which the Attorney General has given to the opiate class of drugs. In 1970, Schedule II(a)(1) read:

> (1) Opium and Opiate, and any salt, compound, derivative, or preparation of Opium or Opiate.

Today, the same Schedule reads thus:

> (1) Opium and Opiate, and salt, compound, derivative, or preparation of opium or opiate excluding apomorphine, the baine-derived butorphanol, dextrorphan, nalbuphine, nalmefene, maloxone, and maltrexone, and their respective salts, but including the following:
>
> (1) Raw opium
> (2) Opium extracts
> (3) Opium fluid
> (4) Powdered opium
> (5) Granulated opuim, and 13 additional listings.

Obviously, all of the substances selected for scheduling here contain "opium" and nominally appear to qualify as scheduled sub-

4

stances under the simple 1970 language. If this were so, however, the work of the Attorney General in adding eighteen new substances would be entirely superfluous. But the controlled substance experts were well aware, and reminded by their pharmaceutical industry colleagues, that under the relevant protocols and criteria of the C.S.A. each of the listed substances was a "legally new drug." Hence, despite the apparently trivial changes (e.g., "powdering"), the medical community maintained that such alteration can possess the substantial result of changing the nature of the original drug and must be evaluated.

In the example of another drug, methamphetamine, the water solution of its salts was originally placed in Schedule II while pills and powders were placed in Schedule III. The form of the drugs permitted different manners of administration, intravenous injection and ingestion. Another form of the drug, the formulation in Vicks Inhaler, was outright exempted. In each case the proper legal treatment was only determined after following the protocols; the presence of the same active ingredient was not determinative. The analogy from this example to the present situation is effectively dispositive of what changes implicate scheduling evaluation. A variation which substantially alters the properties of the nominal drug removes the presumptive control. Review is then to be sought under the statutory scheme.

Therefore, both from principle and from specific examples, the first question in the Appellant's series must be answered in the affirmative. If "crack cocaine" qualifies as a "legally new drug," then it must be scheduled before commencing a prosecution.

    B. Crack Cocaine is a Legally New Drug: The Heart Of
       This Dispute.

5

The dispute in this litigation will of necessity be resolved on the question whether "crack cocaine" must be declared a "legally new drug" to the accepted legal standards of that evaluation. It has been the universal position of Government opponents that Schedule II(a)(4), the "cocaine" schedule, can legally be read all-inclusively to encompass all forms of cocaine, including crack cocaine. For example, in its answer to a § 2255 application in the Eleventh Circuit based on this same argument, the Government said,

> "A cursory reading shows how broad the definition of a cocaine-related controlled substance is – it is essentially anything that has cocaine in it..."

Just from historical example, the Government knows that this type of statement cannot be true. In 1986 it became necessary for the Justice Department to ask Congress to amend the language of Schedule II(a)(4) so that it would include "coca tea," which was unprosecutable at the time for not being scheduled.[2] Nor did

---

[2] See Ronald K. Siegel, Ph.D., Intoxication, pp. 300-301, Simon & Schuster Publishers, New York, N.Y. 1989. In the early 1980's the Peruvian Government's National Enterprise of Coca began marketing "coca tea" in the United States, primarily through mail and health food stores appealing to "yuppies." Dr. Siegel and his research group clinically studied a substantial group of coca tea users for three years and then published the results of the study in the Journal of the American Medical Association. R.K. Siegel, et al., J.A.M.A., Vol. 255, p. 40ff (1986). The conclusion of the study was that drinking coca tea represented a safe form of cocaine use; no one became addicted or suffered ill effects.

When this paper came to the attention of law enforcement officials in the Justice Department, they studied the matter for possible prosecution for cocaine use. But they reached the conclusion that "coca tea" was not a controlled substance and the tea importers, distributors, and drinkers could not be prosecuted under the existent law. However, when the Attorney General considered scheduling "coca tea", Dr. Siegel's study stood as an obstacle to the ordinary justification for scheduling: potential for abuse. Of course, Dr. Siegel's study had shown coca tea to be unabusable per se because denaturing chemicals present with the tea prevented over-use.

Confronted with this development, the Justice Department bypassed the normal manner of scheduling, which would require finding a new reason to schedule, and approached Congress directly. See S. Rep. No. 225, 98th Cong., 1st Sess., 262-63, reprinted in 1984 U.S. Code & Admin. News 3182, 3444-45.

6

this Congressional action create any blanket endorsement that all cocaines were henceforth scheduled.[3]

> "The amendment sought only to clarify the definition of cocoa leaves. This is apparent from both the statutory language and the legislative history."

United States v. Daniel, 813 F.2d 661, 663-64 (5th Cir. 1987).

It is only when the drug Schedule is treated superficially that the Government's interpretation appears valid. Superficiality, however, was expressly proscribed in this jurisprudence. Touby, supra. Given the instruction of H.R. 99-1444 and the empirical evidence of examples like coca tea, three methamphetamines, and eighteen opiums, such a simplistic point of view in this jurisprudence is untenable, even for crack cocaine. This Court must look for the true principles which produced these earlier results; and then those principles must be applied to the crack cocaine example. This is a precise area of penal regulation where the criminal statutes must be strictly and narrowly construed. United States v. Bass, 404 U.S. 336, 92 S.Ct. 515, 30 L.Ed.2d 488 [1971]. The Government's sweeping scheduling position violates constitutional due process because it is purely semantic

---

[3] It is possible to see how all-inclusiveness under a few broad categories, e.g., cocaines, barbiturates, etc., would effectively gut the Act of any meaningful scheduling protection. The possibility of this development was foreseen by some of the drafters of the C.S.A., who believed that the law they wrote could be undermined if not strictly applied.

> "First, there can be no doubt that the Justice Department in S.30 and in H.R. 1858 and its precursors has shown little sensitivity either toward constitutional rights or toward modern concepts of penology and rehabilitation. Whatever bill is passed [as the Controlled Substances Act] may be expected to be enforced by a department affected by these predilections reflected in its original recommendations. Therefore, it is necessary for Congress to speak clearly and unambiguously in opposition to preemptory sentencing practices if such are to be avoided." H.R. 91-1444, Committee on Interstate and Foreign Commerce, 91st Cong., 2d Sess., September 10, 1970, Additional Views.

in an area of jurisprudence that disallows semantics. Even in ordinary statutory interpretation, Courts are required to be critical before accepting mere names like "cocaine" as equivalent within different statutory contexts.

> "It does not follow that when a newly invented or discovered thing is simply called by some familiar name in a statute, most nearly expressing the new idea, that the thing so styled is really the thing meant by the former word."

Proprietors of Bridges v. Hoboken Land Improvement Co., 1 Wall 116, 17 L.Ed. 751 [1864]. Whether the "cocaine" of the schedule is the same "cocaine of "crack cocaine" is a precise legal question to which the Controlled Substances Act, Touby, supra, and the Food, Drug, and Cosmetic Act demand full technical and legal evaluation.

> "The Federal Food, Drug, and Cosmetic Act (21 U.S.C. §§ 301, et seq.) is a detailed piece of legislation whose treatment of many health and food problems is quite specific, and it is the duty of the Courts in construing it to be mindful of its approach in terms of draftsmanship."

Flemming v. Florida Citrus Exchange, 368 U.S. 153, 78 S.Ct. 160, 3 L.Ed.2d 188 [1958].

The Appellant, therefore, argues that the correct analysis of the problem before this Court must utilize the legal definitions and protocols which dictate the requirements for scheduling of any substance to be regulated. To be prosecuted as a distinct substance, the C.S.A. demands that the drug be scheduled as a distinct substance. If the differences between the "new" drug

and the one already scheduled are legally insignificant enough not to evaluate the substance for scheduling purposes, then they are likewise insufficient for the penalty purposes. Crack cocaine is scheduled today only if it is treated *in all respects* as if it were just cocaine; but it is not scheduled if it is legally treated for being the "new drug" crack cocaine.

1. Definitions Of a "Legally New" Drug:

In the context of the C.S.A., a compound is always "legally new" unless and until it is evaluated otherwise by the appropriate agency within the Department of Health and Human Services.[4] This evaluation generally arises at the behest of the Attorney General. By express adoption of Recommendation 10 of the Prettyman Commission, the Department of Health, Education, and Welfare (now H.H.S.) possesses the mandate to decide all technical matters *vis a vis* criminal drug regulation according to the relevant definitions of the Food, Drug, and Cosmetic Act:

> "10. The Commission recommends that a unit be established within the Department of Health, Education, and Welfare to determine the safety and efficacy of and *to regulate all narcotic and dangerous drugs* capable of producing severe psychotropic effects, which can lead to criminal or lawless behavior when abused."

> "Under Reorganization Plan No. 1, a Bureau of Narcotics and Dangerous Drugs (hereinafter B.N.D.D.) has been established in the Department of Justice to regulate all these drugs [including legitimate activities]. *Safety and efficacy will continue to be regulated under the F.D.C.A. by the Department of Health, Education, and Welfare.*"

---

[4] Appellant uses the term "compound" in its generic sense of "unknown substance" as it is generally used by medical personnel in the literature. As such, it may be a new chemical outright or some new combination of chemicals.

9

Prettyman Commission Report, Recommendation 10, and H.R. 91-1444, and Response to the Prettyman Commission, Recommendation No. 10, p. 18. Wherever terms of usage, especially terms of art, are not expressly defined within the Controlled Substances Act, 21 U.S.C. § 801, et seq., therefore, they are to be derived from the definitions contained in the Food, Drug, and Cosmetic Act, 21 U.S.C. § 301, et seq., pursuant to Recommendation 10. For example, 21 U.S.C. § 802 goes directly to the relevant F.D.C.A. section:

> "The term "drug" has the meaning given that term by Section 321(g)(1) of this Title."

While the term "new drug" is not legally defined within the C.S.A., it is defined in and adopted from 21 U.S.C. § 321(p). There, a "new drug" is identified by either of two criteria:

> (1) Any drug the composition of which is such that such drug is not generally recognized among experts who are qualified by scientific training and experience to evaluate the safety and effectiveness of drugs as safe and effective under the conditions prescribed......
>
> (2) Any drug the composition of which is such that such drug is a result of investigation to determine its safety and effectiveness for use under such conditions has become so recognized, but which has not, otherwise than in such investigations, been used to such a material extent or for such a material time under such conditions."

Title 21 U.S.C. § 321(p). The Courts which have approached issues involving the definition of "crack cocaine" have erred in treating some possible chemical definition as though that bounded the nature of the definition. E.g., United States v. Davis, 864 F.Supp 1303, 1307 (N.D.Ga. 1994); United States v. Brown, 859

10

F.2d 974, 976 (D.C. Cir. 1988) (defining "crack" as cocaine possessing an "hydroxyl radical"); United States v. Gaulteau, 4 F.3d 1003, 1004 (D.C. Cir. 1993) (acknowledging that "hydroxyl radical" definition was "simply incorrect"). The appearance is that having exclusive precedents such as Spain, Emerson, and Caudle jaded the judicial viewpoint into thinking that structural chemical newness was required. That thinking is shown here to be legally wrong. Looking for the presence of "cocaine" in "crack cocaine" in order to satisfy the scheduling requirements amounts to only one factor to be considered. Criterion (4), H.R. 91-1444, p. 34. The oversimplicity of stopping the evaluation at this point is a constitutional deficiency to ever sanctioning the substance as scheduled. E.g., Coca Tea.

What must be formally done is evaluate the effects of the drug on a person either to what (1) is already known about the drug acting in people or (2) is honestly predictable about the drug acting in people. The effect of the drug on the person is the defining characteristics of legal newness. A drug that produces standard pharmacological indications of cocaine while containing cocaine is "scheduled cocaine" as prior forms of the drug have been understood. The exact composition is irrelevant. However, a drug which produces major symptoms unreported as standard cocaine indications, regardless whether outright different or objectively more severe,[5] is not scheduled cocaine, whether it contains cocaine or not. For purposes of the overall standards of evaluation, what represents standards for safety and efficacy

---

[5] The statutes provide for emergency scheduling. 21 U.S.C. § 811(h).

11

in the F.D.A. context are replaced with standards for dangerousness and self-abuse in the C.S.A. context. See 21 U.S.C. §§ 811 and 812.

By all the evidence openly discussed by Congress, crack cocaine satisfied the "new drug" criteria under 21 U.S.C. § 321(p). The Appellant will not belabor repeating all the Congressional statements unless challenged by the Government on this point. Especially for the group of people who were particularly susceptible to the effects of smoking crack, Dr. Siegel had identified a new D.S.M. disorder back in 1982 which was prima facie proof under the definitions above that crack possessed one of the defining characteristics making it a new drug compared to any other form of cocaine.

> "The Cocaine Smoking Disorder is a Substance Abuse Disorder (DSM-III) that is distinguished from both medical use of cocaine as well as non-medical recreational use (see Seigel 1977 for a description of these patterns). It presupposes a pattern of pathological use, impairment in social or occupational functioning and a minimal duration of one month."

R.K. Siegel, Journal of Psychoactive Drugs, Vol. 14, p. 332, Oct-Dec, 1982.

There is still another formal legal reason why the Congress was obliged to have crack evaluated for newness: the Supreme Court in 1983 had recently held that both the licit and illicit drug jurisprudence utilize the "whole drug" principle in the evaluation of any substance under consideration for regulation. United States v. Generix Drug Corporation, 460 U.S. 459, 103 S.Ct. 1298, 75 L.Ed.2d 198, 204 [1983]:

12

> "The term "drug" is plainly intended throughout the [Food, Drug, and Cosmetic] act to include entire drug products, complete with inactive ingredients."

In making this assessment in the F.D.C.A. context, the Court was concerned with two factors: (1) That the law which would deal with human beings putting substances into their bodies would be grounded in reality and not legal fictions; and (2) that the criminal sections of the Food, Drug, and Cosmetic Act maintained their legal integrity only under a "whole drug principle."

In *Generix*, the drug company (like the Government in this case) wished to avoid the testing associated with marketing (proscribing) its brand of drug (cocaine). It attempted to convince the Court that the statute only required an evaluation of the active ingredient (cocaine), which it could show was already well characterized according to the definitions (schedules).

The Supreme court rejected this minimal approach as insufficient under the plain meaning of the statutory language. It also held that the "excipient ingredients" were recognized scientifically to often confer important properties on the final drug. It held that the law was drafted to deal truthfully with the properties of the substance which would actually be consumed by a person, i.e., the whole substance.

With respect to its second point, the Supreme Court further found that the "whole drug" principle was legally required for statutory uniformity from the drafting of penalty sections throughout the F.D.C.A.. See *Generix, supra*, at 460 U.S. 459: Product adulteration, § 351(a)(4); product misbranding, § 502(e) (label to include all ingredients "whether active or not"); New

13

Drug Application (N.D.A.), § 505(b) (must contain a "full list of articles used as components of such drug [and] a full statement of the composition of such drug"); and so on. In fact, it was because of the "whole drug" approach of the F.D.A. that researchers in 1980 were required to apply for an N.D.A. on pharmaceutical crack cocaine, "Esterene," in their proposed treatment of rheumatoid arthritis. "Esterene in the Treatment Of Rheumatoid Arthritis," Arthritis News Today, Vol. 2, pp. 1-5, April 1980; "The Treatment Of Active Rheumatoid Arthritis And Allied Inflammatory Diseases," 15th Annual Congress On Rheumatology, June 26, 1981, Paris.

The N.D.A., of course, is the civil analog to scheduling; it is an admission that the practitioners skilled in the pharmaceutical arts did not know enough to use cocaine in this form on people. Furthermore, pursuant to the requirements of 21 U.S.C. § 811(f), the Secretary of Health and Human Services informed the United States Attorney General of the N.D.A. for crack cocaine. The office of Attorney General would have to accept this information as a *fortiori* proof that illicit crack cocaine would require scheduling.

The criminal Courts since Generix have universally employed "whole drug" principles to decide criminal legal matters.

> "[....] both Congress and the F.D.A. recognize that substances are to be judged as a whole, and not merely by whether or not they contain one ingredient."

14

United States v. Housley, 751 F.Supp. 1446, 1447 (D.Nev. 1990) (discussing Vicks exception); also see United States v. Viernes, 763 F.Supp. 1068, 1071 (D. Hawaii 1991) (performing statutory analysis). What is error in any decision that crack is scheduled is not the factual truth that crack contains cocaine but the legal reach being ascribed to that fact. Such a statement, if true, only makes the drug a "mixture" containing cocaine. As such, the mixture would have to be subject to the penalties of § 841(b)(1)(A)(ii) and (B)(ii) for containing a detectable amount of cocaine. In order to sentence for crack cocaine under subsections (A)(iii) and (B)(iii), legally as well as ethically, the drug must have a distinguishable essence that makes it a "substance," not just a mixture.

> "Substance means a distinguishable kind of physical matter. Third New International Dictionary."

United States v. Bishop, 894 F.2d 981, 986 (8th Cir. 1990).

It is maddening to deal with the "Who's-on-First" defenses of the Government which bandy the confusion of "mixture" for "substance." When the Government wishes to show crack as scheduled, it becomes a mixture containing cocaine. But when the harsher penalties come under discussion, it becomes "a new and dangerous substance." It is only the one or the other, both really and legally.

> "If a statute defines a term in its definitional section, then that definition controls whenever that term appears in the Act."