UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

OFFICE

MIGUEL SANTIAGO,                  )          2004 JUN 17  P 4:09
            Petitioner            )
                                  )
        v.                        )    CA 04-30108-MAP
                                  )
                                  )
UNITED STATES OF AMERICA,         )
            Respondent.           )

## GOVERNMENT'S RESPONSE TO MIGUEL SANTIAGO'S MOTION PURSUANT TO 28 U.S.C. § 2255 TO VACATE, SET ASIDE OR CORRECT HIS SENTENCE

The United States of America, its undersigned attorneys,
submits this memorandum in response to Miguel Santiago's 28
U.S.C. § 2255 Motion and Memorandum.

I.   Background

On April 4, 2002 the defendant was indicted in all three
counts of a three count Indictment which charged him with
distribution of more than 500 grams of cocaine (Count One),
distribution of more than 5 grams of cocaine base (Count Two),
and conspiring to distribute more than 50 grams of cocaine base
(Count Three).  The defendant was represented first by Attorney
Hal Etkin then by Attorney Mark G. Mastroianni.  The defendant
pled guilty to all three counts of the indictment on March 3,
2003.  There was no plea agreement entered into between the
parties.  The defendant was sentenced on June 6, 2003 to 135
months in prison, 5 years of supervised release and ordered to
pay a $300 special assessment.  During the sentencing hearing the

1

defendant was advised of his right to appeal both the sentence and conviction but did not file a direct appeal.

The defendant now challenges both the validity of his change of plea and his sentence.[1] The defendant raises challenges which are based upon alleged violations of his Sixth Amendment right to effective assistance of counsel, and the validity of the cocaine base statue. The government responds below to each of these issues. For the reasons set forth herein, the Court should deny the defendant's motions to vacate his conviction and for re-sentencing.

II. Facts

Darryl Petlock, a cooperating witness (CW), purchased cocaine or cocaine base in the form of crack cocaine from Bernie Ruiz on three occasions. On February 15, 2002, the CW purchased 27.0 grams of cocaine from Ruiz for $700 inside the defendant's car. The deal was recorded on audio tape.

On February 28, 2002, the CW purchased 40.8 grams of cocaine from Ruiz inside the defendant's car in the parking lot of the White Hut Restaurant in West Springfield, MA. for $1400. The CW and Ruiz originally attempted to do the deal on February 27, 2002, but Ruiz was unable to get the drugs so the deal was rescheduled for the next day. The CW called Ruiz several times

---

[1]It is unclear exactly what remedy the defendant seeks. See Santiago's Memorandum at 9, Section regarding Search Warrant. [The Memorandum has three separate page numberings].

2

to arrange the deal and during the last recorded phone call at 3:15 pm Ruiz said that he was on his way but was taking his time because the "car is loaded with stuff." The video tape of the deal clearly shows Ruiz as the only occupant of his car when he arrived at the restaurant where the CW was waiting. The CW entered Ruiz's car and they exchanged two ounces of cocaine for $1400. After the deal the CW called Ruiz to complain about the weight and Ruiz said he would make up the difference during the next deal. The meeting as well as the phone calls to arrange the deal were recorded on audio tape.

On March 6, 2002 the CW ordered two ounces of crack cocaine from Ruiz and agreed to pay $1,400. The CW and Ruiz originally agreed to meet at 6:00 pm at the same restaurant in West Springfield. However, during a series of phone calls Ruiz said that it was taking him longer than he thought to cook the crack. The CW kept insisting on doing the deal earlier even if he could only get half the crack but Ruiz became extremely upset and threatened to shoot the CW's customer if the CW did not bring all the money for both ounces of crack when Ruiz was ready. Ruiz complained that he was losing money on this deal because he could make more money selling smaller quantities to more customers. During the last conversation before the deal Ruiz said that his scale was broken but that the CW's customer would have to take what Ruiz had. The CW and Ruiz also talked about a half-kilogram

deal the next time.

Prior to the March 6, 2002 deal between the CW and Ruiz, DEA surveillance agents followed Ruiz. The CW and Ruiz has several telephone conversations prior to 7:30 pm during which Ruiz said he did not have the crack cocaine. At approximately 7:54 pm Ruiz met an Hispanic male who was driving a red Pontiac four door bearing MA registration 1203NL in the vicinity of 134 Putnam Circle, Springfield, MA. After meeting inside the Pontiac for approximately two minutes with the Hispanic male, Ruiz left the area of 134 Putnam Circle and drove directly to the restaurant parking lot, met with the CW and gave the CW 52.7 grams of cocaine base in the form of crack cocaine. These observations were corroborated during Ruiz's post-arrest statement during which he said that on March 6, 2002 he met "Popito" on Putnam Circle, obtained crack cocaine, then immediately met the CW at the restaurant to conduct the drug deal.

On March 6, 2002, Ruiz did not arrive at the restaurant parking lot until 8:05 pm and it was dark. The deal was video taped. Because of confusion caused by the delay in Ruiz delivering the crack cocaine, the CW thought that Ruiz would only have one ounce of crack. Therefore, the CW only gave Ruiz enough money for one ounce of crack cocaine. Ruiz did not count the money while the CW was in the car. The lab analysis revealed that the bag contained 52.7 grams of cocaine base in the form of

4

crack cocaine.

On March 9, 2002 Ruiz and the CW had an unscheduled meeting which was not recorded. Ruiz complained that he did not make enough money on the deal and he wanted another $1,000 for the crack sold on March 6, 2002. Ruiz threatened to shoot the CW's customer if Ruiz did not get the additional money. On March 11, 2002 the CW met with DEA agents and related this information. The DEA had the CW make a recorded telephone call to Ruiz but he was not home. The CW left a message that he would pay Ruiz another $1,000. On March 13, 2002 the CW met Ruiz and paid him another $1,000 for the crack. The meeting was video taped.

The CW set up another purchase for March 21, 2002. Ruiz was arrested when he arrived at the location of the deal. Inside the defendant's car was a 10 mm Smith and Wesson handgun which was loaded. The gun never traveled outside of Massachusetts and the defendant did not have the drugs in the car at the time.

Ruiz cooperated with the DEA and provided the name "Popito", his source of supply (SOS). Ruiz gave the DEA agents the pager number he used to contact "Popito". Ruiz told the agents where he had met with "Popito" and described the area of 129 Putnam Circle, Springfield, MA although he did not know the name of the street. Ruiz said that immediately before his arrest he went to the vicinity of 129 Putnam Circle to arrange the purchase of one-half kilogram of cocaine. Ruiz told "Popito" that he was going

5

to meet his customer and would return within two hours with the money for the one-half kilogram of cocaine. They agreed to meet at the same location. "Popito" told Ruiz to call "Popito's" pager, 846-7467, and enter "335-2329#" when Ruiz wanted "Popito" to meet him.

At approximately 6:30 pm on March 21, 2002 members of the DEA Task Force established surveillance in the vicinity of 48 Putnam Circle. Surveillance agents observed a red Pontiac Grand Prix four door bearing MA registration 1203NL parked directly in front of 48 Putnam Circle. At approximately 7:25 pm the DEA called "Popito's" pager, 846-7467, and entered the code "335-2329#". At approximately 7:30 pm the DEA observed a Dominican male who matched the description of "Popito" provided by Ruiz, subsequently identified as Miguel Santiago, exit from the area of the front door of 48 Putnam Circle and enter the red Pontiac with MA registration 1203NL. Santiago turned the car around and very slowly drove down the street and pulled to the curb in front of 129 Putnam Circle and parked his car immediately behind another car. A DEA vehicle followed Santiago from 48 Putnam Circle to 129 Putnam Circle.

When Santiago stopped the car, DEA agents approached the driver's side and ordered Santiago out of the car and detained him. An officer observed a plastic bag on the passenger side floor. The officer opened the plastic bag and immediately

6

observed a large amount of cocaine in the bag.  Santiago was then
arrested.  At the time of his arrest, Santiago was carrying a
pager with phone number (413) 846-7467.  Lab analysis revealed
that the bag contained 598.9 grams of cocaine.

The DEA obtained consent to search Santiago's apartment at
48 Putnam Circle, Springfield, MA from his significant other,
Maragelli Rosiaro.  Inside the apartment the following items were
seized:  a scale with cocaine residue, cutting material, a
hydraulic press and plexiglass form used to package cocaine, 45.5
grams of cocaine base in the form of crack cocaine, a wallet
containing Santiago's driver's license, and $1,450 in currency on
the night stand in the bedroom.  Among the currency was a $50
bill which was part of the DEA buy money given to Ruiz by Petlock
for 52.7 grams of cocaine base in the form of crack cocaine for
the March 6, 2002 deal.  Also among that money were seven $100
bills given to Ruiz by Petlock on March 13, 2002 because Ruiz
demanded more money for the crack cocaine sold on March 6, 2002.

III.  Santiago's § 2255 Claims Have Been Waived

The defendant was informed of his right to appeal his
conviction and sentence on June 6, 2003.  He was represented by
counsel at the time.  Despite the opportunity to file a direct
appeal Santiago did not do so.[2]  Because Santiago did not present

---

[2]The defendant did not file a direct appeal but he did file
a letter with the Court in October of 2003 which the Court
construed as a Motion for Leave to File Notice of Appeal Late.  A

7

any of the current claims on direct review, he has defaulted and can not now raise these issues. A defaulted claim generally cannot be heard on collateral review unless the applicant shows "cause" for each failure to raise the claim and "actual prejudice" resulting from the error alleged. United States v. Frady, 456 U.S. 152, 170 (1982).

This "cause and prejudice" standard requires Santiago to show not only that "some objective factor external to the defense" impeded his efforts to raise the issue as required by each relevant procedural rule, Coleman v. Thompson, 501 U.S. 722, 753 (1991), but also that the error he alleges "worked to his actual and substantial disadvantage, infecting his entire trial with error," Frady, 456 U.S. at 170 (emphasis in original). The cause and prejudice standard is more difficult to establish than the plain error standard. Frady, 456 U.S. at 164-66. Further, Santiago must make a separate showing of cause for each procedural default, that is one showing of cause for the failure to raise the claim in the District Court, and another for the failure to raise the claim on appeal. But see McClesse v. United States, 75 F3d 1174, 1177-78 (7th Cir. 1996)(the only exception

Notice of Appeal was then filed. However, by Order of Court Entered November 19, 2003, the First Circuit ordered Santiago to demonstrate how the First Circuit had jurisdiction given that the Notice of Appeal was filed almost four months late. Santiago made no such showing and the First Circuit entered a Judgment dismissing the case on December 22, 2003. First Circuit No. 03-2563.

to the cause and prejudice requirement is an "actual innocence" claim by the defendant, which is not present in this case). See also United States v. Mala, 7 F3d 1058, 1063 (1st Cir. 1993)(Cause and prejudice rule does not apply to claims of ineffective assistance of counsel).[3]

Because Santiago has not made the requisite showing, the Court should deny his § 2255 claim without reaching the merits of his arguments.

IV.    No Hearing is Necessary

Santiago is not entitled to an evidentiary hearing. This Court presided over the four day evidentiary motion to suppress and the Rule 11 hearing and has before it the pleadings and Presentence Report (PSR) and the Court can use the knowledge gleaned from its experience in this case together with the undisputed facts to decide this case. United States v. McGill, 11 F.3d 223 (1st Cir. 1993).

V.    Allegations Regarding Violations of 6th Amendment Right to Effective Assistance of Counsel

The defendant alleges that both of his retained attorneys were ineffective for two reasons. The specific allegations are as follows:

_____

[3]It is unclear whether the defendant's claim regarding the scheduling of crack cocaine is an ineffective assistance claim. In his Motion he states "[t]he scheduling of crack cocaine issue is fully jurisdictional and also was not recognized by defense counsel." Motion at 5. Otherwise, there is no mention of this being an ineffective assistance of counsel claim.

9

1)  failure to argue the proper standard during the motion
    to suppress; and
2)  failure to argue that the United States failed to
    schedule crack cocaine.

These arguments must fail, however, because Santiago has failed

to prove by a preponderance of the evidence[4] that Attorney Etkin

and/or Attorney Mastroianni's performance was not reasonably

professional or that their performance undermined confidence in

the outcome of the case.

In <u>Singleton v. United States</u>, 26 F.3d 233, 238 (1st Cir.

1994), the First Circuit explained the basic principles

underlying ineffective assistance of counsel claims

> The Sixth Amendment provides that criminal
> defendants are entitled to the effective assistance of
> trial counsel.  "But 'the Constitution does not
> guarantee a defendant a letter-perfect defense or a
> successful defense; rather the performance standard is
> that of reasonably effective assistance under the
> circumstances then obtaining.' . . . The habeas court
> must evaluate the [challenged] conduct from counsel's
> perspective at the time, considering the totality of
> the circumstances before it, and making every effort to
> eliminate the distorting effects of hindsight." . . .
> We indulge "a strong presumption that counsel's conduct
> falls within a wide range of reasonable professional
> assistance."  Besides bearing the burden of proving
> that trial counsel's performance was not within this
> wide range of reasonable professional assistance, [the
> movant] must establish that counsel's performance was
> sufficiently prejudicial to undermine confidence in the
> outcome of the trial.

<u>Id</u>. (Citations omitted).

---

[4]The burden is on Santiago to demonstrate his counsels'
ineffectiveness by a preponderance of the evidence.  <u>Lema v.
United States</u>, 987 F.2d 48, 51 (1st Cir. 1993).

Seen through the filter of the First Circuit's jurisprudence on ineffective assistance of counsel habeas motions, Santiago's complaints about his counsel do not have merit.

1.    The defendant alleges that his attorneys were ineffective because they failed to argue the proper standard during the motion to suppress evidence seized during the search of the defendant's automobile.  Santiago states "Mr. Elkin did file motions to suppress the fruits of the search of Mr. Santiago's car and the derivative search of his home.  Mr. Elkin's argument was that this had been a Terry stop that transformed into an arrest before police found the drugs in the car.  This argument was wrong..."; ... "When Mr. Mastroianni replaced Mr. Elkin, he answered the Government response to the motion, but kept the same themes.  Thus, Mr. Mastroianni argued Mr. Santiago's suppression to a losing standard of review and filed to recover from error by preserving the issue for appellate review...".  Motion at 1.  The defendant complains that two attorneys argued that the stop of the defendant was not a valid Terry stop, when they should have argued that it was a warrantless arrest which was not supported by probable cause.  Santiago's argument ignores the facts.

Attorney Etkin filed Defendant's Motion to Suppress Evidence in Car together with a supporting Memorandum on July 15, 2002.  In his Motion, Attorney Etkin argues that "the police had no

11

basis to conduct a probable cause arrest of Mr. Santiago based on the information from Mr. Ruiz." Memorandum at 1.

Further, Attorney Mastroianni filed Defendant's Memorandum in Support of Motion to Suppress in December of 2002 prior to the beginning of the evidentiary hearing. This Memorandum was in response to the Government's Omnibus Response to Defendant's Motions to Suppress Evidence, which was filed on August 2, 2002, in response to Attorney Etkin's Motions. The government argued in the alternative that the case involved a valid <u>Terry</u> stop or a warrantless arrest which was supported by probable cause. Attorney Mastroianni argued both that the case did not involve a valid Terry stop [Memorandum at 1-7] and that there was insufficient evidence to support probable cause for a warrantless arrest [Memorandum at 7-10]. The Court then held an evidentiary hearing on December 8, an 18, 2002 and January 8, and 23, 2003. Throughout the hearing Attorney Mastroianni argued that there was not enough evidence to support probable cause for a warrantless arrest. The Court disagreed and denied the Motion to Suppress on January 23, 2003 finding that there was probable cause to support the warrantless arrest of the defendant.

Therefore, the defendant's attorneys properly briefed and argued the suppression motion and Attorney Etkin and Attorney Mastroianni's representation was not ineffective regarding this issue.

2.     The defendant's second ineffective assistance claim, that his attorneys failed to argue that cocaine base, also known as crack cocaine, is not listed in the schedules of controlled substances, must fail because the allegation is not accurate. The defendant's position is that cocaine base in the form of crack cocaine is a "legally new drug." Memorandum at 6; Section regarding scheduling of crack cocaine. Santiago's argument lacks merit.   Title 21, U.S.C. § 812, Schedule II(a)(4) proscribes the possession of, among other things, "... cocaine, its salts, optical and geometric isomers, and salts of isomers; ... or any compound, mixture, or preparation which contains any quantity of any of the substances referred to in this paragraph."

Section 841(a) make it illegal to possess or distribute any controlled substance and § 841(b) establishes penalties for certain specified controlled substances including cocaine and cocaine base.

In <u>United States v. Robinson</u>, 144 F. 3d 104, 108 (1st Cir. 1998), the First Circuit explained how cocaine is made into cocaine base in the form of crack cocaine.   The Court held

> Cocaine base (C17H21NO4) is a natural alkaloid found in
> the coca leaf.  It is a 'base' because it reacts with
> acids to produce a salt.   The naturally occurring
> compound is usually processed by dissolving a paste
> made from the coca leaf in hydrochloric acid (HCL) and
> water (H2O) to create a salt:  cocaine hydrochloride
> (C17H22C1NO4), also known as cocaine (in its powdered
> form).   The salt is water-soluble and may be snorted or
> dissolved in a liquid and injected, but it  cannot be
> smoked.

13

There are several ways to convert this salt into a base. The most common method is to dissolve the salt in baking soda (NaHCO3) and water (H2O) and boil the mixture until it solidifies and dries. The resulting substance is chemically identical to a naturally occurring cocaine base. In appearance, however, the substance is hard and rock-like. This artificially manufactured base is known in the vernacular as 'crack' or 'crack cocaine.' Although crack is not water-soluble, it can be smoked.

Id. at 108 (internal citations omitted).

Therefore, cocaine base in the form of crack cocaine is a "compound, mixture, or preparation which contains a[] quantity of" cocaine, the possession or distribution of which is proscribed in Schedule II of 21 U.S.C. § 812 and is subject to punishment in § 841(a) and (b). For these reasons, the defendant's request for relief on this ground should be denied.

VI.    Conclusion

For the reason set forth above, the defendant's motion to vacate, set aside or correct his sentence should be denied.

Respectfully submitted,

MICHAEL J. SULLIVAN
UNITED STATES ATTORNEY

by: _____
Todd E. Newhouse
Assistant U.S. Attorney

CERTIFICATE OF SERVICE

Hampden,  ss.                    Springfield, Massachusetts
                                 June 17, 2004

14

I, Todd E. Newhouse, Assistant U.S. Attorney, do hereby certify that I have served, by first class mail, a copy of the foregoing, by mail on Miguel Santiago, pro-se, Reg. No. 90654-038, Unit No. 5751, P.O. Box 2000, Fort Dix, NJ 08640-0902

TODD E. NEWHOUSE
Assistant U.S. Attorney